## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN GULBANKIAN, ROBERT D. CALLAHAN, ERIC HARTSHORN and BETHANY PERRY, on behalf of themselves and all others similarly situated,<br><br><br>Plaintiffs,<br><br>vs.<br><br>MW MANUFACTURERS, INC., a Delaware corporation,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**Case Number 1:10-CV-10392-RWZ**

## MEMORANDUM IN SUPPORT OF OBJECTIONS TO CLASS SETTLEMENT

Plaintiffs and Defendant propose that this Court approve a Settlement of claims for rotting and water stained vinyl clad wood windows. Objectors submit this Memorandum in Opposition to Settlement Approval.

## SUMMARY OF ARGUMENT

This Court should reject the Proposed Class Settlement because the Settlement is grossly unfair, inadequate, and unreasonable. As currently proposed, the Proposed Class Settlement will encompass roughly 5 million vinyl clad windows in approximately 275,000 homes across the United States, with an original wholesale market value of over $900 million. The parties' Proposed Settlement sacrifices the interests of hundreds of thousands of Class Members by affording them minimal compensation, which collectively, will likely not approach the actual cost of replacing a single defective window in a house full of rotten windows. At the same time,

the Proposed Settlement reduces the Defendant's existing express warranty obligations for the vinyl clad windows that it knowingly manufactured and sold with design defects that cause rotting of the frame and sashes.

This Court should reject the Settlement because:

1. Plaintiffs have provided insufficient information for the Court and the Class to adequately evaluate the sufficiency of the Settlement;
2. It provides inadequate compensation to Class Members;
3. It reduces the Class Members' warranty rights;
4. The claims process is inadequate and unnecessarily burdensome;
5. It is poorly drafted and has material provisions that are ambiguous, insufficient, or lacking altogether;
6. It fails to include compensation for other significant defects; and
7. The Class notice is inadequate and misleading.

Defendant reverse auctioned this Settlement to Plaintiffs, in light of the stronger, better investigated, better documented, South Carolina Class action, at a time when Plaintiffs were facing significant *Daubert* challenges in light of lesser investigation and testing. The Proposed Settlement is a better deal for the Defendant than the Plaintiff Class.

## SUMMARY OF SETTLEMENT TERMS

The parties' three tier compensation scheme creates the following hierarchy for potential Class Members' recovery: (1) Level 1 Relief (In Warranty); (2) Level 1 Relief (Out of Warranty); and (3) Level 2 Relief. Both levels of Level 1 Relief require the Claims Reviewer, which is unacceptably comprised of employees of the Defendant's own service department, or, if appealed, the Independent Claims Reviewer to find "visible evidence of wood rot in the lower portion of a Window Frame." A definition of wood rot is noticeably missing from the Settlement.

The *starting point* for potential compensation under the Settlement is fifty percent (50%) of the retail purchase cost of a new window. The retail purchase cost is set forth as $298 per window for a small window and up to $443 for a large window. Using $390 as the average

window cost, $195 is the most any claimant could receive for a brand new, rotten window. From there, further age adjustments apply, which reduce the likely payout to less than $100 per window in-warranty, and less than $25 per window out-of-warranty, even if the gross payment cap does not kick in. This does not compare favorably to a minimum per window, real world replacement cost of approximately $550. Additionally the fifty percent (50%) recovery set forth in the Settlement schedule only occurs if Settlement claims do not substantially exceed the historical claims rate after a two (2) year period; until then, the maximum is forty percent (40%.)

## STANDARD OF REVIEW

The burden is on the Plaintiffs and Defendant to prove that the Settlement is fair, reasonable, and adequate. *Rolland v. Patrick*, 562 F. Supp. 2d 176, 178 (D. Mass. 2008) (the proponents of a Class Settlement must prove that a Class Settlement is fair, reasonable, and adequate); *Eubank v. Pella Corp.,* 753 F. 718, 723 (7th Cir. 2014) (criticizing and ultimately reversing the approval of a Proposed Class Settlement involving defective aluminum clad windows where the Settlement was inadequate). The Court must independently and objectively analyze a Proposed Class Settlement before approval. Newburg on Class Actions §11:41 (4th Ed. 2002) ("[I]t is clear that the Court should not give rubber-stamp approval [to a Class Settlement]. Rather, to protect the interests of absent Class Members, the Court must independently and objectively analyze the evidence and circumstances before it in order to determine whether the Settlement is in the best interests of those whose claims will be extinguished.")

Movants assert, in conclusory fashion, that their Proposed Class Settlement is fair, reasonable, and adequate, and relies heavily on a declaration of a mediator. A claim a Settlement was reached after mediation alone does not protect the Class Settlement from judicial scrutiny and does not relieve the parties of their burden to prove that the Settlement is in fact fair,

reasonable and adequate. *In re Bluetooth Headset Products Liab. Lit.,* 654 F.3d 935, 948 (9th Cir. 2011) ("[T]he mere presence of a neutral mediator, though a factor weighing in favor of a finding of non-collusiveness, is not on its own dispositive of whether the end product is a fair, adequate, and reasonable Settlement agreement."); *Eubank,* 753 F.3d at 724-25. (reversing the District Court's approval of a Class Settlement that the parties reached after mediating with two retired judges).

The dispositive question is not whether the Settlement was mediated; but, rather, (1) whether the Settlement is fair, reasonable, and adequate; (2) whether the Parties have provided sufficient information to the Court, such as a Settlement valuation with substantive support, to analyze the Settlement; and (3) whether they have provided adequate information and notice to the Class.

## DISCUSSION

Under the Proposed Class Settlement, the Defendant proposes to pay minimal amounts to injured consumers who complete an unduly burdensome claims process and establish "qualifying" damage. In fact, the amounts Class Members will receive will not even approach the actual cost of replacing their rotten or rotting windows. Further, "In Warranty" Class Members will receive less value than what the Defendant owes these Class Members under its original product warranty. Other Class Members with rotten windows outside of the original warranty or who have windows with stained or warped frames (i.e., on the path to rotting) receive even less compensation and their compensation is capped at $4 million, a paltry amount, in light of both the damage, quantity and value of windows in the Proposed Class. Other Class Members who own the Defendant's windows with rotting wooden vinyl clad sashes are not provided any compensation under the actual terms of the Proposed Class Settlement. Moreover,

the Settlement notices sent to Class Members fail to inform them of such important information as the $4 million cap or a clear deadline for filing a claim for relief.

### 1. **Movants have provided inadequate information to the Class and Court for either to properly evaluate the settlement.**

Movants have not provided adequate sales, Class, or notice information to the Class or this Court for evaluating the fairness of the Proposed Settlement. As a result, they have not, and cannot, carry their burden of establishing that the Settlement is a fair, reasonable, and adequate compromise of the legal rights of absent Class Members.

#### A. **Movants have provided inadequate information on sales, Class size, and value to the Class and to the Court.**

Although a diligent Class Member could mine the Federal dockets to obtain some sales information and attempt to estimate the quantity of windows at issue, the size of the Class, and the value of the Settlement, Class Members should not have to engage in this exercise. Objectors have done so, and have had some additional benefit from information in the South Carolina Class action, but even this information is insufficient to precisely calculate the quantity and value of the product at issue, the size of the Class, and the value of the Settlement, without the use of statistical and market analysis. As parts of the Settlement are capped, the quantity of product or Class Members is absolutely relevant and necessary for a valuation of the Settlement.

Presumably, Movants will file some of this information prior to the final hearing. However, that does not cure the lack of information available when Class Members had to make a decision to stay in or opt out; and that does not cure the lack of information available to Class Members at the time of this very early and unfair objection deadline.

Because of the inadequate information, Objectors have had to employ their expert to approximate the Class size to evaluate the fairness of this Settlement. A. Rhett Whitlock, Ph.D.,

P.E., has estimated the Class sales using the limited sales data available in the filings in the present action and other limited documents that MW Windows and affiliated entities produced in the putative Class action that remains pending in the United States District Court for the District of South Carolina. *Memari, et. al., v. Ply Gem Prime Holdings, Inc., et. al.*, C.A. No. 2:13-cv-850-RMG.   After estimating the Class size and amount of product at issue, and applying the failure rates determined in testing and field evaluations, Dr. Whitlock has shown that this Settlement is woefully inadequate.   *See* A. Rhett Whitlock, Ph.D., P.E. Decl., attached hereto as Exhibit 1.

### B. Movants have provided inadequate information to the Court regarding direct and publication notice.

Movants have failed to detail what resources they are using for direct notice; and which ones they are foregoing and why.  Paragraph 9.5 of the Agreement erroneously codifies MW's representation that "it does not maintain data specifying Settlement Class Members' names and addresses," and simply requires "reasonable efforts" to supply Class Membership data, including warranty sales and service information. Agreement of Compromise and Settlement, ECF 145-1 at p. 28 (hereinafter cited as "Settlement Agreement"). The warranty sales and service database does identify a material portion of the Class, and should be an absolute requirement under *Shutts v. Phillips,* 472 U.S. 797, 812 (1985), not a "reasonable effort" requirement.

Further, Movants have not proffered an adequate explanation of why they are not utilizing MW's warranty parts customer database;[1] why they are not providing notice to MW's distribution "Partners;" or why MW  does not have access to their distribution partners' customer database.  Additionally, as the majority of windows are made to order, Defendant has an order

---

[1] MW may claim that the data base contains non-Class contact information too, but this is not an obstacle.  MW can, for instance, easily search its parts database for shipment information relating to "FR800" replacement sashes, and identify additional Class Members that are entitled to direct mail notice.

database with hundreds of thousands, if not millions, of purchaser contact information – be it the ultimate owner or the builder.

Additionally, the publication notice program, briefly referenced on page 28 in paragraph 9.4, is being handled by the same provider that handled the Pella Settlement notice program that resulted in the modest claims rate in the Pella Settlement, which was ultimately rejected in *Eubank*. There has been no information provided as to what changes have been implemented to improve the effective notice and claims rate for this Settlement.

## 2. <u>The purported remedy for the Class is grossly inadequate and patently unfair.</u>

The parties have offered no substantive evidence to carry their burden of establishing that the Settlement is a fair, reasonable, and adequate resolution of a massively expanded Class that involves windows with a likely wholesale value of approximately $1.0 billion. Whitlock Decl. at ¶8.

The presence of wood rot means there has been a severe compromise of the structural integrity and water penetration resistance of the window. Statement of Engineers, A. Rhett Whitlock, Ph.D., P.E. and Matthew J. Innocenzi, P.E., SC ECF  87.22 at ¶ D[2] (hereinafter cited as "Statement of Engineers").  As a result, the defective windows will need to be replaced. Joel M. Wolf Report Regarding MW Windows V-Wood Product Line, ECF 123-4 at p. 12 (hereinafter cited as "Wolf V-Wood Report"); Joel M. Wolf Report Regarding MW Windows Freedom Product Line, ECF 123-7 at p.14 (hereinafter cited as "Wolf Freedom Product Report"); Supplement to the August 30, 2013 Statement of Engineers, SC ECF 87-61 at ¶ K (hereinafter cited as "Supplement to Statement of Engineers".  The actual cost of replacing a

---

[2] SC ECF citations are to documents on file in *Memari, et. al., v. Ply Gem Prime Holdings, Inc., et. al.*, C.A. No. 2:13-cv-850-RMG. As MW has asserted confidentiality on this document, it will be the subject of a forthcoming Motion to Impound.

single defective window will range from approximately $500 to $1,000 per unit.  Whitlock Decl. at ¶9. The compensation the parties have agreed to, after age deductions, will likely be less than twenty percent (20%) of this real world cost of replacing a defective window.[3]    The compensation for out of warranty or stained windows borders on illusory.

### A.  The RS Means starting point is vague and likely incorrect.

The starting point the parties have used for the RS Means Value, prior to the adjustment, is incorrect and low.  The Settlement does not specify which of the various RS Means Value Guides the Settlement will adopt for establishing the dollar amounts assigned to each standard size window. The Settlement website provides a "recovery calculator" that permits Class Members to obtain estimates of the amount of money they might receive under the Settlement. Inputting specifications for windows into the Settlement calculator and comparing them to the known RS Mean Value Guides indicates that the RS Means Value *Residential Repair and Remodeling Costs Guide* is being used and that the starting value only considers the purchase price of the window, not the installation cost.  Whitlock Decl. at ¶9. Using the RS Means Value *Residential Repair and Remodeling Costs Guide* is improper because this guide does not include replacement costs for vinyl clad windows. Instead, this guide has only average costs for vinyl windows or wooden windows, which both have average costs that are *less* than the average cost for vinyl clad windows. *Id.*

### B.  The relief is far below the actual cost to replace the defective windows.

The inadequacy of this compensation is clear given the actual real world cost of replacing a single defective window will be from at least approximately $500.00 up to over $1,000 *Id.*

---

[3] In the Defendant's 10-Q Report through March 29, 2014, the Defendant estimates that its total net cost of the Settlement will not exceed $5.0 million, which includes $2.5 million paid to class counsel for attorneys' fees and costs. The contribution of any insurance proceeds that will go towards the Settlement is unknown. An extract of this 10-Q Report is attached hereto as Exhibit 2.

Notably, Class Representative Gulbankian claimed that replacing the twenty-eight (28) V-Wood windows in his home will cost between $25,000 and $30,000 ECF 93-1 at p. 23. This equates to $1,000 per window.   The Defendant's field service manager has given a sworn statement that the cost of replacing a single Freedom or V-Wood double hung window "can range from $200 to $800" and that "[t]he cost of replacing multiple windows in a single home can be in the thousands of dollars." Decl. of Jeffrey Cale David, *Hartshorn* ECF 89 at ¶22;[4] *see also* Decl. of Jeffrey Cale David, *Gulbankian* ECF 119 at ¶18. Evidence produced in South Carolina also indicates that the Defendant believed the window replacement cost was much higher prior to requesting approval of this Settlement.   Def.'s ECO 12-022-800 CA recladding in Field (Defendant produced in *Memari* as MW-MEM 016134).[5]   In short, replacing a window in a home is an expensive proposition.

### C.  Age deductions further decrease the compensation.

Movants have capitulated to a schedule of age reductions that further reduce the compensation to Class Members.   These reductions use an eroding warranty period of a window, rather than the industry expected useful life of a window. Settlement Agreement, ECF 145-1 at pp. 20-23. Under the schedule of reductions, the most a Class Member could ever receive for a rotting in warranty window is fifty percent (50%), without installation cost, if the window is brand new. *Id.* at p. 21.   Given that wood rot often takes approximately seven (7) to over ten (10) years to overtly manifest, the more likely scenario is that these Class Members would receive on average somewhere between circa $63 (27.5%) and $28 (22.5%). Whitlock Decl. ¶9.

---

[4] *Hartshorn* ECF citations are to documents filed in *Hartshorn, et. al. v. MW Manufacturers*, Case No. 3:12-cv-cv-30122-MAP before that action was consolidated into *Gulbankain*.
[5] As MW has asserted confidentiality on this document, it will be filed under seal and/or brought for en camera review.

### D. Level 1 (Out of Warranty) and Level 2 Compensation is Worse than Level 1 (In Warranty) Compensation.

The amount of potential compensation afforded to Class Members who have Level 2 damage or Level 1 damage (out of warranty) is even more miniscule. For rotted windows that fall outside the original warranty, the compensation ranges from a high of 10% to a low of 2% of the inadequate starting RS Means Value. This is unacceptable given the likelihood that the water damage due to the latent defects likely began within the original warranty period. Class Members with Level 2 damage, staining, which is the initial stages of wood degradation, receive even less compensation given the range of RS Means Value recoverable is from a high of 7% to a low of 1%.

The Proposed Class Settlement then goes a step further and imposes a $4 million aggregate cap on all compensation for Level 1 out-of-warranty relief (frame rot) and Level 2 relief (staining in-warranty).  The parties offer no explanation or logical basis for the amount of the cap or for combining these two types of claims for purposes of capping their financial obligation.

### E.  The calculations of recovery are inadequate and unfair.

If a Class Member is able to harness all of the required information and complete the extensive claims form, then he or she may receive some level of the nominal compensation afforded under the Settlement. For example, a person who owns the typical sized window valued at $443.42 under the Settlement that is eight (8) years old will receive $22.71 for Level 2 damage or $88.69 for a rotting window that is within the original warranty. If the same window is rotting but is ten (10) to fifteen (15) years old, then the amount of compensation is circa $44.35 under the Class Settlement. This projected recovery for Level 2 damage and Level 1 out of warranty

will be even less if the thousands of potential claimants exhaust the $4 million aggregate cap on these two levels of relief.

Whitlock has estimated that there are roughly 100,000 or more "In Warranty" Class Members and roughly 175,000 "Out of Warranty" Class Members. Whitlock Decl. ¶8.  Applying the $4.0 million aggregate limit applicable to these Class Members results in a potential cap of $14.54 per residence or 80 cents per window for Out of Warranty Level One Damage Claimants and In Warranty Level Two Claimants. (This analysis is complicated by the inconsistency of the Settlement, which places a one year limit on Level 2 claims, and the Notice which does not).

### F.   No compensation is provided for consequential damages.

The woeful inadequacy of the compensation to Class Member is further amplified by the lack of compensation for consequential damages under the Proposed Settlement. The defects in the vinyl clad windows have either caused or will cause consequential damage to the structure via water infiltrating the building envelope through a substantial number of the windows. This results in water damage to interior finishes, trim, stool, drywall, and in more severe circumstances, framing or other components. Def.'s Internal E-mail Chain re: 105 Shipwreck Claim (Defendant produced in *Memari* as MW-MEM 0008541);[6] *see* Wolf V-Wood Report, ECF 107-1 at p. 11 ("Given the nature of the defect, it is highly probable that some of the rough framing and sheathing around the lower window corners has also been damaged by water infiltration and may require repair.") Despite these significant damages to consumers, the Proposed Class Settlement fails to compensate for any consequential damages.

---

[6] As MW has asserted confidentiality on this document, it will be the subject of a forthcoming Motion to Impound.

**3.  The Class Settlement unjustifiably eliminates much of the Defendant's pre-existing and future warranty obligations at the expense of injured consumers.**

The claims process in the Settlement replaces the Defendant's original product warranty for materials and workmanship. It also limits relief for Level 2 damage to claims filed within one (1) year of the effective date of the Settlement. As a result, the Settlement relieves the Defendant of its current warranty obligations to many Class Members at minimal cost. This severely injures Class Members who remain within the warranty period but can only recover the miniscule compensation the Settlement affords.   The one-year period for filing Level 2 claims further eliminates these Class Members' warranty rights.

**A.  The Settlement reduces the rights of Class Members who own defective windows manufactured within the Defendants' ten year warranty.**

The Proposed Settlement reduces the Defendant's pre-existing warranty obligations to thousands of Class Members. Since 1998, the Defendant has marketed and sold all of its vinyl-clad windows with a "10 Year Materials and Workmanship Limited Warranty," a "20 Year Insulated Glass Limited Warranty," and a "2 Year Hardware Warranty." *e.g.,* ECF No. 119-1 (Defendant's "Elite Gold Warranty Coverage" for "MW Freedom/V-Wood Windows").  Under the warranties, the Defendant is obligated to replace any defective components of the windows that fail, including frame parts and sash, without charge to the consumer. The existing warranties do not contain a "sliding scale," age depreciation, or other adjustment that reduces the consumers' warranty rights based on the age or location of the defective window.

**i.  In-warranty compensation provides less relief than warranty rights.**

The Proposed Class remedy and claims program in the Settlement Agreement will replace all the Defendant's obligations under all of its prior product warranties, express or

implied, other than express warranties relating to the IGU (failure of Insulated Glass Unit, e.g., fogging) and hardware (hardware warranty is expired for most Class Members). Settlement Agreement, ECF 145-1 at p. 19 ¶ 5.29. This includes eliminating the outstanding warranty owed to Class Members with windows manufactured within the past ten (10) years, in favor of the Settlement terms. *Id.* As a result, the "adjustment" compensation scheme in the Settlement agreement will apply to homeowners submitting claims for rotting windows less than ten (10) years old and at best, when new, would result in them receiving 50% of RS Means Value for the Window. *Id.* at p. 21.   The more likely scenario is that these consumers will receive only somewhere between 27.5% to 17.5% of window cost only given that it appears that wood rot in these windows typically takes seven (7) to over ten (10) years to manifest in a manner that may be detectable by an astute homeowner. Whitlock Decl. at ¶10.  Consumers who would have been entitled to receive replacements for their defective windows under the original Express Warranty are now limited to compensation that will not cover a respectable portion of the cost of replacing their defective windows.

### ii.  Other damage to windows is no longer covered.

The Proposed Settlement additionally erodes homeowners' warranty rights by eliminating the right to claim for other failures not covered under the Settlement. The Settlement's definitions "qualifying damage," "Level 1 Damage," and "Level 2 Damage" does not provide compensation for other defects and or damage that would have been covered under the product warranties, such as unaddressed glazing leaks, vinyl delamination or splitting, frame cracking, defective mulling, or other defects due to defective workmanship or materials[7] (nor does it address damage to sashes unless a properly executed amendment is filed). ECF 145-1 at

---

[7]  Notably, Whitlock has identified other defects and failure modes in the South Carolina investigation as set forth in Whitlock's Statement of Engineers and Supplemental Statement of Engineers in *Memari*.

pp. 3-4 (limiting the definition of each damage level to the lower portion of the window frame). The Settlement will actually reduce the Class Members' rights and the Defendant's obligations for many defects and deficiencies.

The Proposed Class Settlement encompasses approximately 100,000 homeowners who remain within the ten year warranty period. Whitlock Decl. ¶8. The willingness of the Class representatives and Class counsel to agree to an arrangement that actually reduces the rights of a hundred thousand in-warranty homeowners is puzzling. *See Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (recognizing that one factor to support rejecting a Proposed Class Settlement is "the fact that the Class that was denied relief did not have separate counsel from the counsel for the favored Class.").

### iii. The one year limit on Class Members seeking relief for Level 2 damage is unfair and unreasonable.

The Settlement also works an injustice upon Class Members with the defective windows still in warranty that only show evidence of staining. Section 6.7 of the Settlement Agreement limits Level 2 relief claimants to those who can show staining and file a claim within one year. ECF 145-1 at p. 23 (providing that Level 2 claimants will be eligible for relief "only if the Claim Form for the subject window is postmarked or otherwise received by the Claims Administrator within one (1) year of the Effective Date"). As previously discussed, staining is the initial onset of wood degradation due to moisture damage, incipient rot. Whitlock Declaration at ¶10. After the one-year claim period, homeowners with newly accumulated wood staining are only entitled to compensation only if their wood degradation develops into full blown rot within the initial ten years. A Class Member can have staining (water-caused wood degradation) that is just short of full blown rot, in all of their windows after one year, but if rot does not occur in year ten, that Class Member is not entitled to any remedy.

14

Given the industry accepted "minimum anticipated service life of windows [is] 20 to 25 years", this is patently unfair and wrong. Wolf V-Wood Report, ECF 123-4 at p. 7 (citing to ASTM Standard E 2136-04).

Importantly, under the original warranty, there is no requirement that the purchaser demonstrate the existence of full blown or fully developed wood rot during the warranty period to establish a defect. In contrast, under the Proposed Settlement agreement, this is a requirement. Stated differently, the Settlement relieves Defendant of its remaining warranty obligation for stained windows after the one-year claim period.

**4.   The Settlement claims process is unduly burdensome.**

By requiring a notarized signature and not accepting electronic submission, the Settlement makes the claims process more burdensome than it needs to be.

**A.   A notarized signature is unnecessary.**

The Proposed Class Settlement requires claims to be notarized despite also requiring the claimant to submit to the jurisdiction of the Court and also requiring the claimant to sign under penalty of perjury. When one is submitting under penalty of perjury, in a Federal Court approved claim form, there is no need for the additional step of notarization.  All the Notary requirement does is create one more requirement in the claims process, requiring that Class Members go down to a local bank or other to find a notary to certify their form, and in some instances, to pay the notary for the service.

**B.   Electronic submission should be available for claim forms and pictures, which are mostly digital.**

Neither the claims form nor the Settlement website allows the submission of claims electronically.  In an age when you can order any consumer product on line, schedule appointments, register a consumer complaint, etc. -- all online, the inability to file a claim online

is a stone age claims process. To require Class Members to go to the local CVS or Walmart and pay to print the many pictures these claims require, instead of uploading them online for free, is counter-intuitive.  When one considers that uploaded pictures will have far greater clarity for claims adjustment, the verdict is unanimous – online filing is not permitted as an additional claims disincentive.[8]  Notably, the Settlement could still require an original affirmation by U.S. Mail.

The unreasonableness of the claims process is even clearer when compared to the Defendant's traditional warranty claims process that the Proposed Class Settlement will replace. Under the Defendant's typical warranty claims process, claimants could submit claims documentation electronically and require the owner to submit "identifying information" and include "the nature of the problem described by the homeowner, the age of the window, and sometimes photographs." David Decl., ECF 119 at p. 5. Without explanation, the parties have agreed to a claims process that imposes impermissibly "strews obstacles" in the path of a Class Member. *Eubank*, 753 F.3d at724.

### 5.  <u>The claims form is also materially misleading as to the actual claims period.</u>

The Claims Form contains materially misleading statements to Class Members. The Claims Form misleads Class Members with claims for Level 2 damage to windows within the original product warranty as to the time period they have for filing a claim under the Settlement. The Claims Form states the following:  **"You must submit your notarized claim by the later of one year from the Effective Date, or the end of the Warranty Period applicable to the**

---

[8] Notably, the Settlement Agreement even requires the claims administrator to scan "each claims form and any supporting documentation" within five (5) days of receipt. ECF 145-1 at p.13.

**window that is the subject of your claim."** [9] However, as noted above, the actual Proposed

Class Settlement agreement limits the filing of *any* claims for Level 2 damage to the one (1) year

period following the effective date of the Settlement.[10] This materially misrepresents the time

that Class Members with Level 2 damage to windows that are greater or less than ten years old

have to file a claim. The materiality of this misrepresentation is exacerbated by the fact that the

Settlement also precludes a Class Member from appealing a denial based on the untimely

submission of a claim to the Independent Claims Reviewer. Settlement, *Gulbankian* ECF 145-1

at p. 23 ("Claims that are denied based on untimely submission are not eligible for appeal to the

Independent Claims Reviewer.").

> 6. **In addition to the core compensation problems, the Settlement fails to compensate for other significant defects.**

There are a number of other and overlapping problems with the Settlement, its terms, the

claims process, and the notice, including failure to define "rot", to include sash damage, and to

include installation defects.

> A. **The Settlement Fails to Define Rot; and Fails to Delineate When Staining, Which is the Onset of Wood Degradation, Progresses to the Point Where it Constitutes Rot.**

The Proposed Class Settlement distinguishes among the thousands of Class claimants on

the basis of whether a specific window frame has "visible evidence of wood *rot*" or "visible

evidence of *staining, warping or discoloration*" of the window frame. Despite this substantial

distinction for the treatment of Class Members' claims, the Proposed Settlement fails to define

what constitutes visible wood rot.  The Proposed Class Settlement leaves resolving the issue to

---

[9] A copy of the settlement notice and claims form that the parties actually distributed by  mail to class members, such as Mrs. Conner-Hethcox, is attached hereto as Exhibit 3 and is available at http://www.mwmanufacturersvinylcladwindowSettlement.com/Content/Documents/Claim%20Form.pdf.

[10] Settlement, *Gulbankian* ECF 145-1 at p. 23 ("Claimants are eligible for Level 1 Relief (Out of Warranty) *and/or Level 2 Relief only* if the Claim Form for the subject window is postmarked or otherwise received by the Claims Administrator *within one (1) year of the Effective Date*." (emphasis added)

the discretion of the "Claims Reviewer" in the first instance. The claims reviewer is unacceptably a "current employee of the MW service Department who will make determinations concerning Qualifying Damage under the Claims Program." ECF 145-1 at p. 2

The effect such a determination has on the Defendant's actual liability to Class Members will be substantial given the extreme reduction in compensation for staining. If a five (5) year old window is determined to have visible wood rot then the percentage of RS Means Recoverable is at least 27.5%. The compensation for the same window would only be 5% if the Defendant's employee determines there is only evidence of staining, warping or discoloration. Further, the later determination and payment will go towards the $4 million aggregate cap on the Defendant's liability for Level 1 (Out of Warranty) and Level 2 claims.

**B. The Settlement Agreement Fails to Include Compensation For Sashes.**

The Settlement completely omits any compensation for rotting or staining to vinyl clad wood sashes, a problem that is documented as rampant in the Defendant's own service records. Since the preliminary approval of the Proposed Settlement, the parties altered the Settlement notice approved by the Court to purportedly bring rotting sash damage within the compensation scheme for Level 1 Relief (In Warranty). *Compare* 145-1 at pp. 6 & 64 (defining window frame as "the wooden frame of a MW Vinyl-Clad Window, including the jambs (the sides of the frame) and sill (the lowest or bottom part of the frame)."), *with* the Detailed Class Settlement Notice at p. 4 (which adds the following to the definition: "Wood rot in a MW Vinyl-Clad Window's sash will be treated as Level 1 Damage for purposes of Level 1 Relief (In Warranty) only."), which is attached hereto as Exhibit 4. Further, assuming sashes have been added to the Settlement, the Settlement fails to set forth the compensation scheme for the sashes; and failed to notify Class Members of what the sash compensation scheme would be.

The omission of the sash remedy was a deficiency brought to the Court's attention by the undersigned in a motion to intervene filed on April 24, 2014. ECF 151 at p. 18. If in fact the Parties have modified their Agreement now to include this remedy, a formal amendment needs to be submitted to the Court as opposed to a potentially unenforceable modification to Class notice; and the new compensation plan re-noticed to Class Members.

### C. The Proposed Class Settlement is unfair and prejudicial to Class Members as it fails to compensate for installation defects but releases installers.

The Class Representatives have agreed to a release that is overly broad and strips many Class Members of potentially valuable claims they may have against non-parties to the Class Settlement; most notably, window installers. 145-1 at pp. 35-38.   The Settlement provides no relief for defective installation (typically a larger claim than defects in a window related claim); however, the Settlement strips Class Members of rights against installers.  Indeed, it cannot even be claimed that the Settlement includes compensation for installation defects; exclusion of installation defects is the only possible reason that the Settlement provides relief only for rot in the lower corners of the windows, excluding rot at the head (top) of the windows.[11]   The inclusion of an overly broad release in a Class Settlement is yet another sign of a Settlement that is unreasonable and unfair to absent Class Members.

The error of releasing installers is compounded as the Settlement Agreement saddles Class Members with the burden of a defense and indemnity agreement if the Class Member brings an action against a third party, such as the installer, and the installer brings a claim against the Defendant:

---

[11] It is a common belief in the industry that leaks at the head (top) of a window are more likely caused by installation defects such as improper head flashing or improper secondary moisture barrier weather lapping at the head of a window.

> Releasing Parties agree that in any action brought by a Releasing Party against *any nonparty arising out of or related to the same damage that gave rise to the Releasing Party receiving a remedy under this Agreement*, the Releasing party agrees to defend and indemnify any Released Party against any third-party claims, including without limitation claims for contribution or indemnity.

ECF 145-1 at p.38 (emphasis added). The release not only forces Class Members to sacrifice the valuable right to pursue compensation from third parties, but it also requires Class Members to defend the Defendant against third-party claims.

### 7.  <u>The Settlement notice is inadequate and misleading.</u>

The parties have allegedly mailed potential Class Members who could be identified a short form Settlement notice, a claims form, and appendix.[12] A more detailed Settlement notice has only been made available for access via the Settlement website. All of these documents provided inadequate notice of material terms.

### A.  Tangible or exemplar claim value not provided.

There is virtually no compensation information provided in the short form notice; and the long form notice, while providing lots of percentages, fails to provide any information as to the potential dollar value of a claim.

### B.  Claim cap not disclosed.

Blatantly missing from the short and long form Settlement Notices is any reference to the $4 million dollar aggregate cap on the damages the Class will receive under the Settlement for Level 1 (out of warranty) and Level 2 damages. This alone makes the Settlement notices materially misleading and deprives these Class Members of the information necessary to assess whether to opt out or object to the Class Settlement.

### C.  No disclosure that geographic region and age deduction were new limitations.

---

[12] Exhibit 3.

Neither Settlement notice informs Class Members that Defendant's original warranty did not include any reduction based upon the geographic region of the structure where the window is located or the age of the window, unlike the significant reduction schedules adopted in the Settlement.  Stated differently, neither notice disclosed that consumers would give up their right to 100% compensation under the existing warranty if they failed to opt out of the Class.

### D.  One year limit on Level 2 Claims is not disclosed.

Like the Claims Form, page six (6) of the detailed Settlement notice informs Class Members that the deadline to file a claim is "the later (1) one year from the date the Settlement becomes final or (2) the period remaining on the window's Warranty Period."  This is not true because of the one-year limit on claims for Level 2 damage discussed above. The short form Settlement notice the parties distributed did not even provide Class Members with a definitive deadline for filing claims.

### E.  Ply Gem is inadequately disclosed.

Both notices have multiple references to MW Windows but contain only a cursory statement to alert Class Members that the Settlement encompasses vinyl clad windows marketed and sold as Ply Gem Windows. At a minimum, the Settlement notices should inform Class Members of both the time frame and specific model names for the Ply Gem vinyl clad windows within the Settlement Class.

### F.  Adversarial Claim review not disclosed.

The more detailed Settlement Notice is also misleading to Class Members because it fails to inform them that the initial review *and decision* on their recovery will be completed by the *Defendant's employees*. 145-1 at p. 2 ¶1.1(j) & p. 14 ¶5.14.  These initial claims reviewers will likely be the same service personnel who Movants allege misrepresented and concealed the

defects in the Defendant's vinyl clad windows and have engaged in ongoing "warranty misconduct" through at least the filing of their Consolidated Class Action Complaint on April 22, 2014.[13]  ECF 144 at ¶¶39, 44, 46-59.  Also not disclosed is that Class Members do not get an independent claim review unless they appeal the initial decision.  145-1 at p. 15 ¶5.19.

### G. Publication notice lacks necessary information.

The publication notice has even less information than the Settlement notices; so any significant defect in the written notice would also apply to the Publication Notice.

Taken separately or together, the Settlement notices are inadequate.  They all fail to provide material information about the potential recovery available under the Settlement and the claims process.

### 8. Given the foregoing deficiencies and the pressing, better supported South Carolina motion for Class Certification, one is left with the conclusion that Defendants reverse auctioned this Settlement to Plaintiffs

#### A. The inadequacy of the Class recovery is due in part to the failure of Class Counsel and their expert to adequately investigate or test the defective windows.

The sole defect that the Massachusetts Class representatives and counsel have asserted is Movant's expert Joel Wolf's opinion that improper gaps in the vinyl cladding of the V-Wood double hung product line and Freedom double hung product line expose the underlying wood framing of the window to weather and precipitation.[14]  This singular defect is substantial, but does not include many of the deficiencies in the design, marketing, and sale of the windows documented within the Proposed Settlement Class.

---

[13] *See* Pls.' Consolidated Amended Class Action Complaint, *Gulbankian* ECF 144 at ¶¶39, 44, 46-59 (alleging the Defendant's employees engaged in various misconduct when investigating warranty claims and that "[t]o date, Defendant continues in this pattern of concealment and suppression by deliberately and knowingly misrepresenting to the public the true nature of the problems with the Windows.")

[14] Joel M. Wolf Report Regarding MW Windows V-Wood Product Line dated June 28, 2013, *Gulbankian* ECF No. 107-2 at p. 11; Joel M. Wolf Report Regarding MW Windows Freedom Product Line dated July 31, 2013, *Gulbankian* ECF No. 123-6 at p. 17

The putative Class in South Carolina has conducted an extensive investigation led by A. Rhett Whitlock, Ph.D., P.E.  Dr. Whitlock has conducted hundreds of engineering investigations of water penetration and leakage of buildings since 1983.[15]  In the South Carolina case, Dr. Whitlock inspected approximately 350 installed windows in 14 or more residences and performed ASTM compliant water testing on 6 new or unused windows and on 6 installed windows.[16]  He personally traveled to the National Certified Testing Laboratories in Pennsylvania and inspected dozens of MW/Ply Gem test specimens that the Defendant used to obtain the ratings that it represented to consumers on window labels. He also reviewed dozens of the Defendant's test reports, hundreds of drawings, and hundreds of pages of the Defendant's internal documents produced in the South Carolina lawsuit.

Through his thorough investigation, Dr. Whitlock documented a host of severe deficiencies, *in addition* to those identified by Mr. Wolf:

1. The Defendant used doctored test specimens to obtain third-party certifications required by applicable building codes;
2. Gaps at the bottom frame corners under the sill and at the top ends of the sill nailing fin and at the sill to jamb intersection" lead to water intrusion;
3. Wide-spread glazing failure due to the "Defendant's failure to design a glazing process and/or system that results in consistently acceptable, leak proof windows:"
4. The Defendant's wood treatment process prior to March 2012 is insufficient and vastly inferior compared to its competitors; and,
5. The installation instructions are inadequate to prevent leakage.

Dr. Whitlock has also opined that the lack of proper certification of the windows contributed to the Defendant's sale and distribution of windows that consistently leak.[17]  Additionally, the South Carolina Class offered additional support to establish that the Defendant inappropriately labeled

---

[15] Declaration of Rhett Whitlock, PH.D., P.E., dated April 15, 2014, *Memari* ECF No. 109-1 ¶2.
[16] Supplement to the August 30, 2013 Statement of Engineers, SC CM/ECF 87.61.
[17] SC CM/ECF 87.22.

and marketed their products as "Certified" and misused the term "structural DP rating" through the expert investigation of an additional Engineer, Mr. Do Kim.[18]

Mr. Wolf did not document these additional defects, perhaps because of the limited scope of his investigation.  He did not perform testing on a single window; and did not investigate the casement windows. In fact, Mr. Wolf has never even personally seen a vinyl clad window within the Proposed Settlement, ECF 104 at p. 1, 7. The Massachusetts Plaintiffs' narrow scope of investigation resulted in the Defendant filing substantial *Daubert* challenges to the admissibility of Mr. Wolf's expert opinions in both *Gulbankain* and *Hartshorn*, relying in large part upon Mr. Wolf's total lack of scientific testing. *Id.* at 7-13, 15-19 ("[T]he root of the problem with Mr. Wolf's causation theory is his utter lack of testing. Mr. Wolf's opinion that water is getting into wood at the jamb/sill intersection and causing it to decay is nothing more than an untested hypothesis.")

Dr. Whitlock's ASTM compliant testing vastly exceeded Mr. Wolf's efforts and resulted in actual test data that substantiates not only Mr. Wolf's suppositions, but also the additional defects and modes of failure documented by Dr. Whitlock. Dr. Whitlock's testing confirmed that a number of new vinyl clad windows failed at levels below the performance levels represented on the window labels and thus that the Defendant's modifications to the windows over time did not remedy their inadequate water penetration resistance.[19] Dr. Whitlock's laboratory testing also verified that the casement model windows suffer similar inadequate resistance to water penetration.[20] While it is difficult to comprehend how Plaintiffs could effectively negotiate a national casement window Settlement without having investigated, let alone tested, the casement

---

[18] Do Y. Kim, P.E., Fenestration Analysis of Ply Gem Vinyl Clad 600 & 800 Series Windows, dated August 29, 2013, SC CM/ECF 87.60.
[19] Statement of Engineers, A. Rhett Whitlock, Ph.D., P.E. and Matthew J. Innocenzi, P.E. of Whitlock Dalrymple Poston & Associates, Inc. (WDP) dated August 30, 2013, at pp. 16-18, ¶¶19), 20), 21), & 22), SC CM/ECF 87.22.
[20] SC CM/.ECF 87.14-87.21.

windows, the parties have now included *all* models of the Defendant's vinyl clad windows into the Proposed national Class Settlement.

Dr. Whitlock conducted ASTM E 1105-08 field water penetration testing of six (6) of the Defendant's vinyl clad windows installed in two (2) different homes in South Carolina.[21] He tested three (3) Series 800 windows (one (1) elliptical fixed and two (2) single double hung),[22] which were manufactured and installed within the applicable ten year warranty period (circa 2006/2007 for each with a replacement sash set supplied by the Defendant for one of the double hungs, which was manufactured in 2008 and shipped to the Reids/installed circa 2013),  Dr. Whitlock also field tested three (3) windows within the Series 600 model window line (two (2) single double hungs and one (1) mulled double hung), which were also manufactured and installed within the applicable ten year warranty period (circa 2004 for the mulled double hung and the sash set for one of the single double hungs; 2010 for one of the single double hungs; and 2012 for the replacement frame of one of the single double hungs supplied by the Defendant).[23] Dr. Whitlock's field testing of the windows from both the Series 800 and Series 600 window lines replicated the failure mode/water intrusion path of natural rain events with controlled field testing and confirmed these windows leaked at unacceptable levels and caused wood rot and other damage to the window frame and surrounding building components.[24]

In short, while the expert opinions of Dr. Whitlock and Mr. Wolf reached similar conclusions regarding one of the deficiencies in the vinyl cladding, only Dr. Whitlock's findings were based on a thorough scientific investigation that included actually inspecting and testing

---

[21] SC CM/ECF 87.39, at p. 1.
[22] SC CM/ECF 87.39, at pp. 1-4
[23] SC CM/ECF 87.39, at p. 22.
[24] SC CM/ECF 87.39, at pp. 1-45.

various windows; and only Dr. Whitlock took the breadth and scope of his testing to a level many times Mr. Wolf's limited investigation.

The foregoing shortcomings in Mr. Wolf's investigation prevented Movants from identifying and asserting numerous other severe defects with the Defendant's window. These failures, at a minimum, reduced the Movants' ability to effectively negotiate a Settlement that is reasonable, fair, and adequate for the thousands of Class Members included within the vastly expanded Class.

> **B. The known facts and circumstances surrounding the parties reaching an agreement to settle a vastly expanded national, all-encompassing Class do not support finding it was the result of good-faith and arm's-length negotiations.**

In each of their respective motions for Class Certification, the Class Representatives sought to certify limited Classes comprised only of the owners of structures in Massachusetts with either V-Wood Windows installed since 1995 or MW Freedom/Freedom 800 Windows installed since 1990.[25] Neither motion sought to certify a national Class. Moreover, both motions were filed following multiple extensions under the respective scheduling orders.[26]

With these motions to certify limited Classes pending, facing the substantial *Daubert* challenges to their only expert witness' opinions, and without the thorough expert investigation of Dr. Whitlock,[27] Class counsel negotiated the terms of a nationwide Class Settlement that now

---

[25] *Gulbankain* ECF 93 (seeking to certify a limited Class comprised solely of "[a]ll individuals and entities that have owned, own, or acquired homes residences, buildings or other structures physically located in the Commonwealth of Massachusetts, in which MW V-Wood Windows are or have been installed since 1995."); *Hartshorn* ECF 63 (seeking to certify a limited Class comprised of "[a]ll individuals and entities that have owned, own, or acquired homes, residences, buildings, or other structures physically located in the Commonwealth of Massachusetts, in which MW Freedom and/or Freedom 800 Windows are or have been installed since 1990….")

[26] *Gulbankain* ECF 93 (filed on October 4, 2013); *Gulbankian* ECF 67 & 86 (expanding the deadline for filing a motion for Class certification from August 5, 2013, to October 4, 2013); *Hartshorn*, ECF 63 (filed October 31, 2013); *Hartshorn*, ECF 36 (scheduling order establishing an October 31, 2013 deadline for filing a motion for Class certification). It is noteworthy that the Court denied the parties' request for a 90 day extension of the deadlines in *Hartshorn* via electronic order, ECF 49.

[27] Since at least May 8, 2013, Class counsel was aware of the putative Class action lawsuit on behalf of injured South Carolina homeowners and actively chose not to review any information regarding the expert investigation in

includes any and all of the vinyl clad windows the Defendant has ever manufactured during the past twenty-seven (27) years.[28]

Based on the available documents, this expanded the Class from an estimated 2,700 (Massachusetts Class Members only) to 275,000 (national Class). Likewise, the estimated wholesale product value of the windows involved in the Settlement increased from approximately $10 million to $1 billion. Whitlock Decl. ¶8

Class Counsel has offered nothing to explain why "[i]n the course of reaching the Settlement, the parties concluded a nationwide Settlement, encompassing claims of similarly situated homeowners from across the country was an appropriate resolution" for the absent Class Members from other states and the South Carolina putative Class who is represented by counsel and who was vigorously pursuing their claims against the Defendant and affiliated entities before having its case stayed by this Court's ruling. While this may be logical from a certain standpoint, this does not excuse the failure to investigate this case in the expanded geographical region.

Moreover, the mediator (Prof. Eric Green) has also failed to offer any explanation of how this became an appropriate resolution during Settlement negotiations.[29]  Prof. Green has relied on the facts presented to him, which included only the limited expert materials in evidence in this case (evidence only of improper gaps in the windows' vinyl cladding).  He was deprived of the benefit of South Carolina expert Dr. Whitlock's investigation and opinions and the evidence of

---

South Carolina or otherwise discuss the actions against MW Manufacturing. Declaration of Michael J. Flannery in Support of Plaintiff's Memorandum in Opposition to Motion to Intervene, for Postponement of Hearing, Discovery on Adequacy, and for other relief by James Schiller and Robert Vaughan, Individually and on Behalf of All Other South Carolinians Similarly Situated, *Gulbankian* ECF 159 at pp. 1-2.

[28] Agreement of Compromise and Settlement, *Gulbankian* 145-1 at p. 7 (describing the "Settlement Class" as "All individuals or entities that own or have owned homes, residences, buildings or other structures physically located in the United States containing vinyl-clad wood-framed windows manufactured by MW Manufacturers, Inc. from January 1, 1987 to the present, including, but not limited to, double-hung, casement, awning, sliding, fixed, special shape, picture, transom and side light windows sold under the names V-Wood, Freedom (a/k/a "Freedom Clad" or "MW Clad"), Freedom 600 (a/k/a "Builder Series 600" or "Series 600"), Revere or Freedom 800 (a/k/a "Pro Series 800" or "Series 800")").

[29] *See* Declaration of Eric Green in Support of Class Action Settlement, *Gulbankian* ECF 148.

illegal, leaking windows on which those opinions are based (evidence of Defendant's doctored test specimens to obtain third-party certifications; bottom frame corners gaps under and at top ends of sills and at sill/jamb intersections; glazing failures; Defendant's improper wood treatment process prior to March 2012; and Defendant's inadequate installation instructions).

Neither unsupported claims of arm's length negotiations nor logic can explain why the Defendant would agree to settle on a nationwide basis where there was no legitimate possibility for the certification of a nationwide Class.[30] Instead, the massive expansion became "appropriate" at the expense of absent Class Members and allows the Defendant to avoid its liability to a South Carolina putative Class and to avoid the precedent that might be set in the South Carolina action where scientific testing has been performed and expert opinions have been formed to support the putative Class claims that the Defendant illegally manufactured and distributed the windows in South Carolina and that the Defendant used doctored test specimens to claim invalid performance characteristics on its labels.[31] Such a massive expansion of a Class for purposes of Settlement, alone, is a red flag for a collusive and unfair Settlement.[32]

It is also noteworthy that the parties did not enter the Proposed Class Settlement until *after* the South Carolina putative Class had fully briefed its Motion for Class Certification.[33]  In

---

[30] See In re Melendex Colon, 265 B.R. 639, 643-44 (B.A.P. 1st Cir. 2001) (holding the bankruptcy court erred in granting relief that was not raised or requested by the parties)

[31] Dr. Whitlock's inspections of the Defendant's NCTL test specimens confirmed that they were doctored to obtain building code-required third-party certification and that the windows manufactured and sold did not conform with the certification test specimens, making the windows illegal for sale in South Carolina and other states that have adopted the International Residential Code ("IRC").  Under the IRC, all windows must be tested and labeled in accordance with the American Architectural Manufacturers Association (AAMA) industry standard for performance criteria. AAMA's industry standard for performance criteria can only be satisfied by successful completion of all applicable testing, certification and labeling requirements outlined by AAMA 101.  Under AAMA 101's testing protocol, a window's performance characteristics are measured by a group of three tests that assess a window's ability to withstand water infiltration, air infiltration, and wind loads. See Exhibit C to Whitlock Declaration.

[32] *See* Eubank v. Pella Corp., 753 F.3d 718, 721 (7th Cir. 2014) (noting that a Class Settlement that combined the two separate Classes previously certified and "purport[ed] to bind a single nationwide Class" was the "first of many red flags that the judge failed to see).

[33] Plaintiffs' Reply Memorandum in Further Support of Plaintiffs' Motion for Class Certification, *Memari* ECF 109 (filed April 15, 2014); Agreement of Compromise and Settlement, *Gulbankian* ECF 145-1 at p. 42 & 43 (providing

fact, the Defendant has acknowledged that the extinction of the South Carolina putative Class action is crucial to the Class Settlement Proposed to the Court: "If South Carolina were carved out, there would be no Settlement, and all Settlement Class Members throughout the United States would be deprived of its benefits."[34]

## **CONCLUSION**

This Settlement fails on its terms: the breadth and content of the notice, its claims program, its relief, and its administration.  Inadequate information has been provided to support approval.  And the expected compensation is woefully inadequate and unfair.  It should be rejected.

Dated: September 12, 2014                    Respectfully Submitted,

s/ Justin Lucey
Justin O'Toole Lucey, Esquire
(S.C Fed. ID No. 5613)
 JUSTIN O'TOOLE LUCEY, P.A.
415 Mill Street
Post Office Box 806
Mount Pleasant, SC 29465-0806
Telephone: (843) 849-8400
Facsimile: (843) 849-8406
Email: jlucey@lucey-law.com

and

David Pastor (BBO#391000)
Pastor Law Office, LLP
63 Atlantic Avenue, 3d Floor
Boston MA 02110
Telephone: (617) 742-9700
Facsimile: (617) 742-9701
E-mail: dpastor@pastorlawoffice.com

---

that "[t]he Agreement will be without effect until and unless all parties to this Agreement have executed a counterpart" and showing the Settlement was executed on April 18, 2014).
[34] MW Manufacturer's Opposition to Motion to Intervene, *Gulbankian* ECF 157 at p. 5.

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 12, 2014.


s/Justin O'Toole Lucey
Justin O'Toole Lucey, Esquire